Last case on the morning's docket is in the Marriage of Carrell with the intervening party, Joseph Jankiewicz. Am I pronouncing the name halfway right? Jankiewicz, Your Honor. Pardon me? Jankiewicz. Okay. I have mispronounced it every time. Okay. You're up first again, Mr. Brewer. Are you ready to proceed? I am. Okay. We're going from criminal court to divorce court, I guess now, or family court. I've tried this one, so I'm very familiar with all the facts of this one. May it please the court, counsel, as it relates to this case, this is a family proceeding that originated out of a filing of a motion for leave to intervene on behalf of the grandfather of the minor child in question, and the grandfather being Joseph Jankiewicz. His daughter, Jody Jankiewicz, Carrell, was previously married to Christopher Carrell, a child, came out of their relationship, and she subsequently died on March 5, 2008. After that point in time, Joseph Jankiewicz filed a motion to intervene. It was granted. An order was entered allowing him to intervene in the case. He then filed a petition for custody and for temporary relief and other relief requesting custody of the minor child of his daughter and Mr. Carrell. What happened at that point in time is there was, based on affidavits, the court made a ruling. It came to this court, and this court sent it back demanding that an evidentiary, that the intervening petitioner being Joseph Jankiewicz was afforded an opportunity to have an evidentiary hearing on the matter. We then had an evidentiary hearing, and now the Honorable Paul Lamar made a ruling denying, basically in essence stating that Joseph Jankiewicz Carrell, the intervening petitioner appellant, had no standing before this court to proceed forward with a petition for custody of his child. And as I sit here, I know the court obviously we're working under the Illinois Marriage and Dissolution of Marriage Act 750-ILCS-5-601B2, whereby a person other than a parent can file a petition for custody so long as the child is not in the physical custody of one of his parents. I conceded the court, and I argued in the underlying court, when I said physical custody doesn't mean the actual physical possession, and that's not what we base our standing on, that merely because Grandpa had the child on March 8th and kept the child for a period of time before the father was informed that the mother was deceased, that's not where we base our claim of standing. It's prior to the death of Jody Jankiewicz Carrell, and that's – and it's all of that evidence that we believe is very, very useful, and in looking at it, we feel the court can come to no other conclusion than to say that the grandfather had standing here to proceed with custody. Now, does it mean that he ultimately prevails looking at the presumptions in favor of father and everything else? That would be for the court to decide. But in this case, to merely say he doesn't even have the standing to seek it based on the evidence that was presented to the court I think is wrong. And in the marriage of Kerry, it's clear that physical custody doesn't mean the actual, but it's actually the legal custody. He has the right legally to move forward and have custody of this child. Counsel in the underlying case in the court cited two cases talking about that in the event of the death of one parent, automatically custody is vested in that other parent. I don't believe that to be the case. I believe that it can be vested in the other parent of the child so long as there are factors existing that would warrant their ability to step into those shoes and to have it. And in this case, I believe filing a petition for custody under the circumstances there is standing. And the reason there is standing is when you look at the history of this case, the father had very little, if any, hardly any interaction with the minor child from his birth for a period of time. In fact, the father himself testified that he was living in New York, found out about the existence of this child, and proceeded to move to fly over the top of West Frankfurt, Illinois, where this child lived, and moved to California and lived there in California. Ultimately, a divorce was entered in this case, and I cite specifically to that because in the judgment of dissolution of marriage entered on January 24th, 2005, it provided inter alia that sole custody, full legal and physical custody of the child was awarded to the mother, Jody Chicanich Carroll. And in addition to that, noted that considering that the father lived in California and his contact between the father and the child has been limited, visitation shall be supervised by wife at her home or surrounding area for the next eight visits. In addition to that, there's a paragraph in the judgment for dissolution of marriage that afforded the father an opportunity to come back to this court and seek additional visitation. We're limiting your visitation down here, basically in control of the mother. And you can come back and seek additional if you want. There is some disagreement as to the exact number of times that the father visited this minor child from 2005 through 2008 at the time of the mother's death. But one thing is for sure that in essence from the child's birth until then, if you give the father the benefit of the doubt and say you visited every single time you claim you visited, contrary to evidence presented and argument presented by the grandfather as to how much time, it adds up to a total of about 2% of this child's life that he actually physically saw his child. He doesn't participate in sporting events. He doesn't participate in school activities. He doesn't check in on his health care because he can because he lives in California. He doesn't go to the doctor. He doesn't show up to sporting events. He doesn't go to parent-teacher conferences. He doesn't do anything. He visits once, maybe twice a year at the most. And that's all he had done. That's the sum total of the contact between this person and the minor child. The rest of the evidence, unrefuted evidence, is that this child spent 75% or more of every day of his life with his grandfather at periods of time living both with his mother and he in the home and also with Jody, Jekinj, Carol, the mother of the child, living in a separate home and the child getting on the bus every single morning to go to school at Grandfather's house, getting off the bus at Grandfather's house. And Grandfather testifying that the child spent at a minimum three to four days every single week leading up to the death of the mother in his home living there. He had his own room. He had everything set out there for him. I believe under the circumstances, an argument by the father has been always, well, I didn't know this was going on. No one came to me and said because when I dealt with visiting or I had issues, I talked to Jody. I assumed she was in control and the child wasn't affected. Would it make any difference if he did know this was going on? Well, I think if he did know, he would have absolutely no ability to stand here and object to. I mean, if someone walked up, if Grandfather walks up to him in the summer prior to the death or three months prior to the death and says, by the way, your child's living in my house and he's my kid, and then you proceed to allow that to go on, you don't seek any relief from the court. You don't do anything. What happens if you said your ex-wife, the mother, is working or what have you, and he spends two to three to four days a week over at my house and just leaves it at that? Does that change this at all? I mean, it may go to the best interest standard, but we're way before we get to that. Long before that, we're really talking about standing, and I think it – I don't know if it has a big effect if he's told about it one way or the other. But I think in essence for standing, all that really matters is was it happening or was it not? Because the father's knowledge of it, while it could impute upon him an acceptance, an acquiescence in it that ultimately would get in the best interest would be even more devastating for the father. I think merely at the standing level, we're still really talking about just what actually physically was happening with this child. About the only thing, and I'll concede that the father has, and I'm sure counsel's going to bring it up a lot, is the mother moved to the state of California the year prior to her death for a brief period of time. It happened? April through August. Yes. She – the boy was out there, wasn't he, from April through August. She went out in January. That is correct. In essence, from January or February of the year preceding her death, for two to three months the child lived solely with grandfather while mother was out in California. Then the child went out there basically to live for the summer and was there. While there, I would note that the only visitation that took place was twice. She was there for three to four months, and the father, who had seen the child once, maybe twice a year up to this point, now has the child living in his backyard. And sees the child twice. He didn't seek any leave of the court. He didn't ask to remove the case to California. He didn't – One of those times was for three weeks. Well, he argued that it was for that period of time. I think grandfather – I think some additional evidence was it wasn't for that period of time, but I mean that's – I think father claimed it was about two weeks, I think, two to three weeks that he had. But the mother exercised sufficient custody and authority over the child to say, the granddad, will you keep my son, I guess, for three months, but he's coming with me to California. And then she brought him and put him in school out there. She was maintaining her role as custodian of the child. During that brief period of time, I would say she was. But when she returned in August and came back to the state of Illinois, which the father did nothing to stop or seek leave of the court for any additional visitation or anything else, nor seek custody, everything went right back to the way it was before. The child went back to the home of grandfather, and the child continued to proceed from August, September, October, November, December, January, February, right up until her death in March. Everything went right back to normal, the child living in grandfather's home. So when I think you look at the totality of the circumstances and looking at standing here, there is a window of time of about four months where the mother exercised pretty much exclusive control over what was going to happen to this child. I can't argue with that. It happened. She lived with him in California. There was no evidence she wasn't a good mother to this child. I mean, even from your evidence, it seems to be the opposite, that she was a loving mother who worked a lot of hours and her family helped her raise the child. She cared for the child and loved it. It's difficult. You have a father of a daughter. You have a grandfather of a child, and asking him to say, well, your daughter was a horrific parent when she was deceased, no, I didn't ask him that, and I didn't make him say that in court. But in looking at all the evidence from the other witnesses who came in who were independent, who testified, neighbors, bus drivers, other people who said, that child is Joseph DeCanning's son. I mean, that's his son. They didn't call him grandson. They said, that's his son. I mean, he lived there. Everyone else in the community who were independent viewed that relationship as a father-son relationship. Everyone who spent the other 98% of the time seeing this child felt that, saw it, described it in that manner. And so in looking at it, when you say that, would I say she was a loving, caring mother? Do I think she loved her child? Yes. Do I think she did what parents should do, which is put your needs at once, second, and far subservient to what's best interest of your child? No, she didn't, because she allowed someone else to raise this child to the extent that the entire community viewed this child as the son of someone else. And I mean, as a parent, I just don't know how you allow that to happen if you are, in fact, deemed a good and responsible parent doing what's best, unless you felt what's best for the child was to live somewhere else. And so in essence, in looking at all that, and we're really just – we're still at the initial first hurdle, so to speak, of the custody hearing. We're just standing. Can father even stand before this court and present additional evidence saying what should be in the best interest of this child? That's all we're talking about here is legally had the father done everything that's required to circumvent and divest everyone else in the world from even seeking custody of this child. And I stated it in my brief, and it wasn't an offhanded statement or meant in any disrespectful manner, but I truly believe that in this case someone living as far away as he did, not basically knowing what went on in the home while he was there. He says, well, I had no idea the child was living with Grandpa because I always talked to Mom, and she set up when I had visitation and stuff. But he never came out here, came and investigated it. He didn't call neighbors or other people or find out about it. He didn't file with the court and say, hey, I want my son. Well, I want him the whole summer. I live in California. I get to see him once, maybe twice a year. Give me some more visitation here. Never did any of that. Perfectly fine with the circumstances. And when I say that if a parent visiting and engaging in activities with a child about 2% of his life is sufficient to divest everyone else in light of the overwhelming evidence by everyone else in the community who said that young man was the child, the son of Grandpa Joseph Jokanich. Then I don't know that you could ever have standing unless, in essence, the child just simply lived with you 100% of the time and the parents just basically dropped the kid off, walked off, and said, I don't care what happens here. Because under the circumstances, I think legally he has a right to proceed to this court and say the best interest of this child is to live with me because that's the way it's always been. But to say you sufficiently availed yourself of your legal rights to be a parent by doing, I don't even think the bare minimum. I mean visiting once, maybe twice a year over the course of this child's entire life, I don't think avails yourself the bare minimum of what you should do as a parent to not anyone else even having standing. So we would ask this court to overturn the findings of the trial court and remand this back in fine standing on behalf of the grandfather and allow this case to proceed forward with a hearing on the merits as it relates to the best interest of the child. Thank you. Thank you, counsel. Mr. Martin. May it please the court, counsel. My name is Curtis Martin. I'm a Sean Martin NPC here in Mount Vernon. I represent the respondent, I believe, Christopher Carroll. As the father, Chris has been a factor of the Superior Rights Doctrine, as it's been announced and detailed in the Peterson case, the Supreme Court case that I cited in the brief. And this means that Christopher, as the father, has the superior right to the care, custody, and control of his son, Donald, before December 2000. And this is what Section 601B2 is intended to foster, intended to protect, that is, the superior rights of the parent. So under Section 601B2, any non-parent can petition the court for custody if they show that the child is not in physical custody of one of the parents. Now, although Section 601B2 references physical custody, as counsel has already mentioned, it's not the physical possession that is the key. Otherwise, to comply literally with the statute, it would foster, as the Peterson report noted, it would foster child abductions in order to actually comply with the statute. So we're talking about legal custody. And, by the way, it's been mentioned, but I want to mention it again. Section 601B2 is the section that allows a non-parent to even get in the ballgame. We're not even to the best interest test at all. It's just, can he be involved in a proceeding regarding the child? And this court in Archibald said that, with regard to the legal custody, that the petitioning non-parent bears the proof of, by the way. I will state that as well. Counsel has mentioned that Mr. Carroll would have to divest everyone else, but that's not the way it is. He has the superior right as it starts. It would be a non-parent who must come in and show that he has somehow relinquished that right. And, in fact, Archibald used the term voluntarily and indefinitely relinquished his legal rights. So it's not Mr. Carroll's burden at all. And there is nothing in this record that would remotely suggest that Christopher Carroll had indefinitely and voluntarily relinquished his custody of his son. Except, of course, for the mother when that initially, when the child was born and when the dissolution of marriage was filed some, actually granted, some five years later. To suggest, as counsel has, that my client traveled from New York to California knowing about this child is absolutely inaccurate. The record reflects, and I've detailed that at page three of my brief, the record reflects that my client didn't learn that he was the father of this child until May of 2002, a year and a half after the child was born. Because of statements that had been made by the mother to Mr. Carroll and because the child had been born prematurely, just doing the math from the time of the consummation of the marriage to the time of the birth of the child, all led him to believe this wasn't his child, based on the statements of his own wife. So, by virtue of a paternity test, that revealed in May of 2002 that the child was his. He was already in California at that point and had been all of this time until recently before the trial he had moved back to the St. Louis area. So, he began, as soon as he learned that he was the father of the child, became paid child support, began making contact, such as it may be, with a one and a half, two year old child, and began sending cards, having phone calls, things of that nature, and began his visits in April of 2003. He visited in April, again in June, again, and this is in 2003, he visited again in January of 2004, April of 2004, August of 2004, tried in November of 2004, but couldn't because the child was with his mother in Georgia. He visited again in January of 2005, August of 2005, again attempted in November of 2005, but again the child was with his mother in Georgia visiting other family members. He admitted he only visited once in 2006, but that's the time that both he and the child were in school, and he had tried in March of 2006, the child was in, he tried in August of 2006, but family members from Georgia were up visiting in Illinois with him, and then he tried again in November of 2006, and as had been the case in two prior years, the child was with his mother in Georgia visiting family. And let me stop right there and say, Mr. Jaconich, by his own admission, was not involved in any of the visitation arrangements. He, by his own admission, stayed out of Mr. Carroll and his daughter's life. That's the way he wanted it done. So how would Mr. Jaconich know when Mr. Carroll was visiting? Counsel had indicated there was some dispute about that. My client clearly set out all the times that he had visited, how long he had visited, what he did, where he went with him, all those things that Mr. Jaconich had no ability to dispute because he wasn't there, because he wasn't involved. Then we come to 2007, and this is when Jody Jaconich comes to California. Mr. Carroll didn't even know that was occurring until he had a conversation about setting up the next visit, and then the child comes about a month and a half later to California. He comes in April. By May, Mr. Carroll has already visited for a long weekend in his own home, and then in July, he visits for three weeks. Again, no ability for Mr. Jaconich to dispute that because he wasn't there, he wasn't involved. Three weeks, Mr. Carroll visits with the child in his own home, and then in an extended family's home in Seattle, Washington. When he tries to call Jody, the mother, in August of 2007 to set up another visitation, he finds out that Jody and the child are back in Illinois. He didn't even know it until he had contacted her to make that next arrangement. Once Don and Jody had returned to Illinois, then Mr. Jaconich again visited in December of 2007. That's the last time that Mr. Carroll visited with the child when Jody was alive. Each visit involved Mr. Carroll coming to Illinois from California halfway across the nation. He had to make arrangements with his own work, he had to deal with his own school schedule for some period of time when he was in school, he had to deal with periods of time when he was unemployed, and just financial constraints are the way they are. So, he had a consistent scheduled visitation with this child, and it showed his interest in this child that would not make any reasonable person believe that he was somehow voluntarily and indefinitely relinquishing his rights to this child. There was never one word spoken between Mr. Carroll and Mr. Jaconich, or even Mr. Carroll and the mother, about Mr. Jaconich caring for this child or this child living with him on some consistent basis. Every exchange for visitation, except for three times that Mr. Carroll described, were at Jody's home when he picked up the child, and were at Jody's home when he returned the child. The only time that he ever had any arrangements with Mr. Jaconich for visitation was in March of 2007, when Jody was in California, and Donald was still in Illinois, and Mr. Carroll had already made his arrangements ahead of time to visit in March of 2007, and so Jody instructed him, hey, set up that time with my dad. So, he did, except for nine months between August of 2001 and May of 2002, and then another three-month time between May of 2003 and August of 2003, Jody lived in her own home. Those other 12 months, collectively, she lived in Mr. Jaconich's home with her child, at a time when she was unemployed, at a time when she stayed home and took care of the children, while the rest of the Jaconich family worked. They were outside of the home. So, any time she was in Mr. Jaconich's home, it was when she was primarily taking care of the child, and even when she obtained her heavy operator's job, which required early hours, late evenings, when the child would be at Mr. Jaconich's home, it was more convenient by Mr. Jaconich's own testimony for the child to remain at Mr. Jaconich's home, and even in that circumstance, three to four nights a week, the child was still staying at Jody's home. By Mr. Jaconich's own admission. So, for him to claim that 75% of the time, or all of the time I took care of the child, it was a matter of convenience. It was what families do to help someone who's working long hours. They help with the child, get him ready for school, get him off to school, get the homework done in the evenings, do those kinds of things. But never was there any evidence that Jody had relinquished custody of this child, and certainly no evidence that Mr. Jaconich, I mean Mr. Carroll had relinquished custody of this child. Mr. Jaconich, or Mr. Carroll had no reason to believe that Jody was not the custodial parent of this child. When the judgment for dissolution of marriage was entered in January 2005, it did recognize that Mr. Carroll had limited contact with the child because he had been in California, and it recognized that he would continue to have some limited contact with the child just by virtue of practicality. Very difficult to get halfway across the nation every other weekend to visit with the child. And Mr. Carroll described that his visitation was, quote, going really well, end quote, and so he didn't see any modification or any additional visitation because he didn't see a need for it. He had been doing very well. He was visiting when he could. There were breaks at school for himself, breaks on vacation for himself and his work, and breaks for the child from school. So he did what he could in that regard. In March 2008 when Jody took her life, Christopher didn't know this. Christopher didn't know this because Mr. Jaconich didn't tell him until Christopher contacted Mr. Jaconich to say, hey, where's Jody? I can't get a hold of her. I'm trying to set up my March 2008 visitation. What's going on? That's when he told him that Jody was dead. That was 13 days after she had died. Within six days, Mr. Carroll is back in the law to retrieve his son. And it's at that time and at that time only, for the first time, that Mr. Carroll remained aware that Mr. Jaconich might be challenging him for custody. It's when Mr. Jaconich refuses to allow him to take his son and serves him with the ex parte order allowing him to intervene in the case and a petition for custody, an emergency petition for custody. In less than a month, we're in court before the court with a motion to dismiss where, as counsel described, the affidavits were presented and the trial court has made the decision that the child should become my client. Has there been any subsequent grandfather visitation in order or anything like that? Nothing like that. There's not been a petition. It was all with regard to the standings. I mean, I'm just curious. Has there been any visitation? Has there been any? Yes, with the grandfather. I don't believe there was any question with regard to that at trial. There may have been, I don't recall. But no, there has not been. Where's the child now? Pardon me? In St. Louis with my client. Has been since April of 2008. Okay. The court goes no further in describing what those visitation rights were, how often they were exercised, how often they were missed, anything of that nature. Let me ask you this, and I don't want to take up too much of your time, but this is a 2-619 motion to dismiss. Yes, sir. Okay. And Mr. Drew appropriately referenced the standard of review as de novo. Yes, sir. Now, I don't think you addressed the standard of review in your brief. If you did, I missed it and it could be in there. Now, in this case, Peterson doesn't make reference to a standard of review. Dial actually refers to it as manifest way to the evidence. But there's numerous cases in these standing cases where they say it's de novo. But the only trouble I've got, we sent this back for an evidentiary hearing that lasted a couple days. Did you address at all the standard of review?  That's a big thing, Gus. The standard of review. Either way, whether it's manifest or de novo. I don't think it makes any difference. I think the evidence is sufficient. No matter what the standard of review is applied to this, that my client didn't voluntarily and indefinitely relinquish his custody. And I think, Justice Bonner, you hit on something when you asked County. You said, would it make any difference if my client knew what was going on with regard to the arrangements? And I think that's where Peterson makes a very pointed statement. And I quote it. It says, with regard to the father, it would not reasonably occur to the father that the maternal grandparents had physical custody of his child and were developing a position of standing so that upon the death of his wife, he could be deprived of his right to custody of his child. That's exactly the case here. Every arrangement for visitation, every conduct that was made with regard to the status of this child, regarding health, school, anything else there was, was made by my client with the mother. He had no indication, none, that the grandfather would be developing some sort of standing to challenge him for custody upon the untimely and unexpected death of his child's mother. So I think Peterson just hits it on the head when it describes that my client had no reasonable, no reason to believe that Mr. Tuchonich was developing any kind of relationship with the child. After all, the evidence presented was that Mr. Tuchonich lived about a mile and a half away from Mr. Tuchonich. Mr. Carroll would expect him to have a great deal of activity with his grandchild, and he described it. There was nothing out of the ordinary to him when he observed. In fact, when he picked up the child at Jody Tuchonich's home and dropped him off for the visits, he saw that the child had a bedroom, a bed, desk, toys, all things that a child would have. Everything that a reasonable person would believe this child was here. In conclusion, Your Honor, it was Mr. Tuchonich's burden of proof. He's failed to meet it. The trial court heard all of the evidence, made a well-reasoned decision, and it's November 18, 2009, in order, and we submit that it should be deferred. Counsel. First, as it relates to counsel's assertion that Mr. Tuchonich has no ability to dispute when he thought of visiting the child, nothing could be patented more wrong. The fact of the matter is that the child lived primarily, the vast majority of the time, except for a very specific few months in California with his mother, he lived primarily with Grandpa. He knew when his visitation was because his grandson wasn't at his home, and when his grandson wasn't at his home, he knew where he was. He might be with Mom for a brief visit, or he would be with his father for a brief visitation. So he knew he could object and testify very precisely when visitations took place, except for a small period of time in California. Shy as I'd be to tell you exactly when. The reason being is the child lived with him, and he knew that. And as affirmed by all of the neighbors and family and community who said they thought the child was his. I mean, they knew it wasn't, but in essence, in looking at it, that was a father-son relationship. And when you look at this, the counsel also stated that Mother primarily took care of the child in the home of Grandpa when she lived there. But he's only got, and I think he's right about the time frame, approximately about 12 months she lived with her father. But there's testimony from the father's long-time paramour, grandfather's long-time paramour, that when the child was an infant, the crib was actually in the bedroom of Grandpa and his paramour. They'd been together nearly 20 years. I mean, you can't call them husband and spouse, but it's as close as you can get. They fought on in a lot of marriages, but the child's crib was in their room. I mean, so this isn't a case of, you know, Mom took care of the child and all of a sudden a few years later came back and said, hey, can you watch my child for me, as Father tries to implicate this is. From the birth of this child all the way through, the child lived in this house. The crib was placed in the bedroom of Grandpa, and that's where it was on a nightly basis with Mother in the house. In addition to that, when Father talks about, when counsel talks about the Peterson case, that this is exactly right, but in the Peterson case it's the opposite of this. In that case, the mother and the child lived in the home of her father. So with the father coming and visiting, Mother's there. The child's not living with Grandpa. I'm not living with a third party who is not, has the legal right to have custody. The child in that case was living in the home with Grandpa, Mom, and Child. So, of course, if you're a father showing up to get your visitation and you see Child with Mom and Grandpa and you know Mom is living in the home, if Mom and Grandpa are both in the home at the same time for the entirety of the child's life, such as Peterson, it's presumed that Mom was actually exerting her control as the mother of the child because she lived there. But in this case, nothing could be further from the truth. The child lived with his grandfather while Mom lived in a separate home down the road. I mean, this isn't where she lived in the house with him and was exerting parental duties over him. In addition to that, there was testimony in there, and nothing could be more poignant as to what the child's position was as to who was his parent. It's when Father came to take the child, which was testimony in this case. The child ran running and screaming to Grandpa, refused to go with Father. Father had to physically force the child by picking him up and shoving him into his car and taking him away. It was the way he got control over this child after the court's initial ruling based on the affidavits only. That's what it required to get the child away. That was testimony placed in evidence, unreviewed, by anyone that that's what took place. In addition to that, when counsel talks about, well, the parent has to voluntarily and indefinitely relinquish their rights, it's the legal rights that custom. I'm not saying that even if this child's standing is found for Grandpa and if Grandpa ultimately would receive custody, the father won't get visitation rights. In fact, I think he probably would because he had exercised some visitation rights for a period of time of this child's life. He has some role in the child's life. But I'm not asking to adopt this child. I'm not asking for straight-up guardianship or to say that he is so ill-reviewed as a parent that his rights have to be wiped out completely. And that's not the burden to which I have to avail myself or my client. Merely first whether or not legally someone has given up their rights to have custody. Not that he's given up his rights to have visitation because he exerted some visitation. But what he had given up voluntarily, and you can do it by saying it or you can do it by your actions. And by you sitting out in California and visiting with your child once, maybe twice a year at best, not flying to Illinois, not coming to parent-teacher organizations, sporting events, not even bothering to come to find out that everyone in the community in which your child lives says, that child is the son of Joseph Dukang. We know it's his grandfather, but that's his dad. You spend so little time asserting your legal rights to custody that you don't even know this is going on. Because surely if he had, he would have filed a petition to modify custody before the court and said, hey, I have a superior right over mom, over grandpa here. If mom's alive and she doesn't want the child to live with him, then he's mine. And had he done that, very well could have been a different story. You think he could have changed custody based upon the facts prior to her death? Because she's de facto given up custody? Do you think that would have happened? I would have liked to have tried the case on his behalf because I think if you're in a position where you say a parent is not exerting their right to custody over a child and a third party is doing it, I'm the father. At that point in time I can come in and exert that if I've done certain things. But he never did that. He never even had enough contact and interaction with the child to even know that everyone in the community considered this child the son of Joseph G. Cage. So I don't think the requirement is that he has to say, by way of everybody, I'm voluntarily and indefinitely relinquishing my rights to custody of this child. I want everybody to know it. I want you to be clear on it. You do it by your actions because actions speak far louder than people's words. And the actions in this case where the father had done virtually nothing to assert his legal right to custody over this child throughout the child's life, where Grandpa had done just the opposite, had asserted it all along. And I think that the noble standard is what it is because he filed a motion to dismiss my pleading requesting custody of the child. And the court made it, while it was an evidentiary hearing, it is still a granting of a motion to dismiss. And I believe in the court's order it says we grant the motion to dismiss and strike the pleadings with prejudice that he has no standing and therefore cannot proceed forward with this petition. So for those reasons, we'd ask the court to overturn the claim. Thank you. Gentlemen, thank you very much today for your arguments and your briefs. We'll take the matter under advisement and get back with you all shortly. We'll be in recess until tomorrow morning.